IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:05CR149 |
| vs. | ) | |
| | ) | REPORT AND |
| AARON OLIVO, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's MOTION TO SUPPRESS (#19). The motion was heard July 14, 2005, and the hearing transcript (#32) was filed August 8, 2005. The motion was deemed submitted August 22, 2005 after the court received correspondence from defense counsel that he had decided not to file a supplemental brief.

Defendant moves the court for an order suppressing all evidence and statements obtained as a result of the February 22, 2005 seizure of his person and the search of his vehicle. He specifically alleges the seizure of his person and search of his vehicle occurred without reasonable suspicion, probable cause, a search warrant, or consent, in violation of his Fourth Amendment rights as guaranteed by the United States Constitution. Additionally, he moves for suppression of all statements made while in custody, claiming they were made involuntarily, in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966), and contrary to his privilege against self incrimination as guaranteed by the Fifth Amendment of the United States Constitution.

The government counters that the stop of the vehicle was based on probable cause (a traffic violation), that the initial contact with the defendant was proper based on *Terry v. Ohio*, 392 U.S. 1 (1968), and a Nebraska law permitting the warrantless arrest of a person

by officers with probable cause to believe that a misdemeanor (here, obstructing and reckless driving) had been committed in their presence.  The government also contends the search of the vehicle was permissible as a search incident to an arrest and/or officer-safety search, and an inventory search.

## FACTUAL BACKGROUND

Jodi Sautter testified she is a ten-year veteran of the Omaha Police Department. On February 22, 2005 at 2:30 a.m., she was on duty in the area of 13th and Castelar, with her partner, Amy Oetter, when she observed a Blazer driving at a high rate of speed. The Blazer turned west on Castelar, crossed an oncoming traffic lane, and ran a stop sign at 16th and Castelar before turning quickly turning into an apartment complex (6:5-11). Sautter characterized the driving as reckless (7:2-7).  She observed the driver exit the Blazer and run in a northeasterly direction, while leaving the lights of the vehicle on (6:16-20).  She was able to get a fairly good look at the driver and described him as around 5 feet 6 inches tall with dark hair, wearing jeans (17:3-4) and a black coat (6:21-7:2).

Sautter testified she chased the suspect on foot for less than twenty seconds, and after failing to catch him, she set up a perimeter search (9:14-23).  She noted ten cruisers were involved in the perimeter and that after twenty to thirty minutes of searching, she returned to the Blazer to arrange for a tow as the license plates were improper and police could not locate a VIN number (10:3-12).

Sautter testified that when she returned to the Blazer, the vehicle's headlights were off (11:7-12) and Oetter told her she had seen someone quickly shut a garage door near the Blazer (11:18-20).

Sautter testified she called for backup, announced she was a police officer, and ordered the person out of the garage. The person did not answer or open the garage door. Sautter could hear someone moving in the garage so she tried to open the door, but the door would not open; it was almost as if someone was standing on the door (12:10-20). She described the garage as having several doors, but one big bay inside. Within two to three minutes officers opened the garage door and entered the garage (15:16-23). Sautter noted that she observed the defendant standing in the garage, however, he was not dressed the same as the suspect she had seen earlier (16:17-19), but rather was wearing sweat pants which were on backwards, white tennis shoes which were too small for him, and a different coat (16:17-24). The defendant threw up his hands and said, "Okay, Okay." (17:10-13). She handcuffed him and asked his name, he responded "Aaron Olivo" (18:3-9), and told her he was in his apartment when he observed someone trying to break into his Blazer (18:20-25). Sautter asked the defendant his apartment address; however, he could not provide it and told the officers he did not know the numbers. (19:1-6).

Sautter testified that about five feet from the defendant she located a holster (20:15-17; 21:2-5), and in a tool belt hanging on a pole next to the defendant (23:20-24), she located a loaded Bryco arms pistol (23:4-24:3). Sautter noted that a short shotgun was also located about 30 to 40 feet from the defendant, in a sack (65:12-22).

Sautter testified that after the holster and handgun were discovered, the defendant was placed in a cruiser and she returned to the Blazer because a tow truck had not yet arrived (24:23-25:2). Sautter noted that her decision to tow the Blazer was based on Omaha Police Department standard operating procedures (Ex. 4) governing when a

vehicle may be towed. Sautter noted the vehicle had no VIN, and she was not able to determine if it was registered (30:1-3).

Sautter testified that in preparation for the tow, she searched the Blazer and located a little black pouch with a magazine containing eight live 9mm rounds (28:25-29:12) behind the driver's seat on the floor (29:17-22).

Sautter testified that when the defendant was taken into custody, he was asked what he was doing and he responded that he had seen someone breaking into his vehicle. When asked which vehicle was his, he stated the Blazer (30:7-14). Sautter testified the defendant was arrested for obstructing because she recognized him as the person who ran from her after he failed to respond to her verbal command to stop, and for reckless driving (31:9-16).

Sautter testified that within a couple of minutes of locating the magazine and ammunition, she made contact with Jennifer Gilpatrick, who was dressed in a big, black coat that was too big for her and identical to the coat worn by the suspect who had abandoned the Blazer (33:15-19).

Sautter testified that while she and the defendant were in the cruiser waiting for the tow, she executed a *Miranda* form (Ex. 5), by reading each question to the defendant and recording his responses (34:6-35:1). She then informed the defendant that she recognized him as the suspect who had run from her. The defendant responded, "Well, is it illegal to run from you? You guys did not even have your lights on." (35:20-25). Sautter noted that during the pursuit of the Blazer, her cruiser did not have its emergency lights on (36:1-4).

On cross-examination Sautter testified she was a passenger in the cruiser and that Officer Oetter was driving (37:18-23), and that during the Blazer pursuit, neither she nor

-4-

Oetter activated the emergency lights (40:22-25). She stated that the speed limit at 13th and Castelar is 30 miles per hour, and during the pursuit the cruiser was traveling in excess of 50 miles per hour and was not catching the Blazer (42:1-7).

Sautter testified that when the suspect fled the Blazer, the cruiser had already turned onto the gravel road (43:19-24), and she lost sight of the suspect when he was about 75 feet away (45:5-8). She denied the lighting in the area was moderate to dim, noting the cruiser spotlight was directly on the suspect's face. She described the suspect as wearing a big, poofy coat with the hood down, and black or dark blue jeans. She was not able to recall the color or type of the shoes the suspect was wearing (48:23-49:20).

On cross-examination Sautter testified she and Oetter searched the established perimeter looking for the suspect for twenty to thirty minutes (52:7-12), and when she returned to the Blazer she could not remember whether any officer had been specifically stationed at the Blazer during the search (53:24-54:2).

Sautter testified on cross-examination that after she returned to the Blazer, Officer Dek observed a Hispanic male coming from the apartment complex and move toward the garage, but while she was with Dek at the time, she was not aware of his observations (54:10-21; 55:5-16; 57:2-10).

On cross-examination Sautter testified that after her attention was drawn to the garage door and she became aware that someone might be in the garage, she and other officers announced their presence stating, "open up, police." (58:22-59:2). After the garage door failed to open, officers lifted the door and observed the defendant standing inside the garage (59:6-17). The defendant held up his hands, was patted down and was handcuffed (60:17-61:3). At the time he was seized, the defendant had the keys to the

Blazer in his hand and the Blazer was visible through the open garage door (61:7-25). Sautter stated that at one end of the garage there is a padlock on a plywood door; however, the rest of the garage is an open bay which she characterized as a chop-shop, a place where stolen vehicles are taken to remove pieces which are then placed on other vehicles for resale. She noted the garage contained tools and pieces of a dismantled stolen vehicle (64:11-25). Sautter testified that from when she returned to the Blazer from the perimeter search until the defendant was arrested, was probably three minutes (66:4-12).

Sautter testified on cross-examination that she first observed the Blazer at approximately 2:32 a.m., and that the defendant's *Miranda* form (Ex. 5) lists the time started as 4:05 and the time ended as 4:25 (68:13-69:12), and that the defendant never admitted possessing any of the firearms (69:20-22).

On cross-examination Sautter explained that during the chase of the Blazer, the emergency lights on the police cruiser were not activated because the police do not initiate the lights until they attempt to get a license plate and before that occurred the Blazer stopped and the driver ran away (72:15-24).

On redirect examination Sautter testified that following the perimeter search, Oetter did not tell her she saw someone going to the garage, but rather told her she saw someone standing inside the garage quickly shut the garage door (72:25-73:7).

Amy Oetter testified she is a four-year employee of the Omaha Police Department and on February 22, 2005 she was assigned to the uniform patrol bureau, actively patrolling the streets and taking radio calls. At about 2:30 a.m., along with her partner Sautter in the area of 13th and Castelar, she saw a Blazer traveling on 13th Street make

an fast turn in a reckless manner and travel southbound on Castelar (79:23-80:15). As she attempted to catch the vehicle, she observed it traveling at a high rate of speed as it turned down an alley toward row of garages (81:3-82:2). She watched the Blazer stop, the driver's side door open, and a suspect run from the vehicle (82:3-8). She observed as Sautter exited the cruiser and began a foot pursuit which lasted about a minute and a half (82:14-15). Oetter testified that while she was not sure if the engine of the Blazer was running, she was sure that the headlights were on (83:10-14).

Oetter testified that when she returned to the vicinity of the Blazer from the unsuccessful perimeter search, she heard shuffling near the Blazer and saw a person quickly move into an open garage door, and shut the door quickly (86:3-16). She then radioed for additional police cars. There was no response to the officers' requests that the person come out of the garage. According to Oetter, while the officers were standing outside they could hear sounds "as if someone's trying to turn the handle to – to lock the garage door into the track itself.... And we could see some movement on the outside handle on the garage door itself." (88:10-23). Oetter entered the garage (86:3-23), after the garage door was opened by Officers Aaron Anderson and Shawn Sheridan (88:7-9). Upon entering, she observed the defendant standing 10 to 12 feet inside the door (89:6-18).

Oetter testified on direct examination that after the defendant was placed in a cruiser she was standing by the cruiser, telling the officers to put a hold on the vehicle because they couldn't find the VIN plate, when the defendant stated that the reason he ran was because he had a suspended driver's license (93:4-17). She noted that at the time

he made the statement no one had asked him a question and he was just talking, stating various things, and just making lots of statements (93:4-94:1).

On cross-examination Oetter testified after the Blazer stopped and the suspect ran, she pulled the cruiser up behind the Blazer and used her headlights and spotlight (98:9-22), and that there was a free standing pole light in the area (98:16-99:13). Oetter noted that before the perimeter search began, the driver's door was open (101:16-18) and the Blazer's lights were on; however, she was not sure if the vehicle was running (101:4-15). Oetter testified that when she returned from the perimeter search, the headlights were off and the driver's door was closed (101:25-102:3).

Oetter testified on cross-examination that when she observed the defendant in the garage, she got a clear look at his face, but was not able to positively identify him as the person she observed exit the Blazer (108:16-24). She admitted that the defendant had different clothes than the person she had seen running (108:25-109:2).

On redirect examination Oetter testified that when the defendant was handcuffed, four or five officers were present, but she did not recall any officer saying anything to him (113:20-25). She noted that after the defendant was removed from the garage and an initial sweep of the garage was made, Sautter approached her and said, "that's the guy, that's the guy we were chasing." (115:6-12).

## LEGAL ANALYSIS

### A. Seizure and Search of Defendant's Person

In this instance, Officers Sautter and Oetter were unable to complete a conventional traffic stop of the defendant's vehicle, although they had probable cause to stop the driver

for committing traffic offenses. *See, e.g., Whren v. United States*, 517 U.S. 806, 810 (1996). Nebraska law permits a warrantless arrest when the arresting officer has probable cause to believe that a person has committed a misdemeanor in the officer's presence. Neb. Rev. Stat. § 29-404.02(2)(d) (Reissue 1995). Here, both officers Sautter and Oetter personally observed the driver of the Blazer commit several misdemeanor traffic offenses. The driver parked the vehicle near the garage and ran away, leaving the headlights on and the driver's door open. Approximately 30 minutes later, the officers returned to the Blazer and found it with its lights off and the door closed. At that time, Oetter heard the shuffling noises and saw the garage door closing.

After the defendant was found in the garage, Officer Sautter positively identified him as the driver of the Blazer. I find that the officers had probable cause to arrest the defendant for the traffic violations committed in their presence. At the time he was arrested, the defendant had the keys to the Blazer in his hand, and the keys were not discovered pursuant to any search of the defendant's person. In any event, "[a] lawful custodial arrest justifies a contemporaneous warrantless search of the arrested person. the officers were entitled to search the defendant's person for weapons or evidence incident to his arrest." *United States v. Brooks*, 2 F.3d 838, 842 (8th Cir. 1993), *cert. denied*, 510 U.S. 1137 (1994); *Chimel v. California*, 395 U.S. 752 (1969).

### B.   Defendant's Statements

"Miranda protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions

-9-

'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted). In this case, the defendant was taken into custody immediately after he was discovered hiding in the garage, and the statements complained of were all made while the defendant was in custody.

Turning to the individual statements, the defendant reportedly threw up his hands and said, "Okay, Okay," after the officers opened the garage door[1] and discovered him inside. This statement was volunteered and was not made in response to any "interrogation." Officer Sautter then handcuffed the defendant and asked him his name. Routine biographical data is exempted from Miranda's coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996).

Officer Sautter testified that when the defendant was taken into custody, he was asked what he was doing and he responded that he was in his apartment and saw someone breaking into his vehicle. When asked which vehicle was his, he stated it was the Blazer. Sautter then asked the defendant his apartment address; however, he could not provide the address and said he did not know the numbers. In context, these were not the "routine questions" an officer may ask a driver who is stopped for a traffic violation. *Cf. United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 646 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000) (during a traffic stop, the officer may ask the

---

[1]Defendant has not asserted any ownership or privacy interest in the garage itself and there is no evidence of any such interest.

motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and the officer may act on whatever information is volunteered). Since Officer Sautter could positively identify the defendant as the driver of the Blazer, she should have known these questions were reasonably likely to elicit an incriminating response. I will recommend that these statements be suppressed.

After the defendant was placed in the police cruiser, Officer Oetter was standing nearby, telling other officers to put a hold on the Blazer. She testified that the defendant said he ran because he had a suspended driver's license. I find that this statement was not made in response to any question, was volunteered, and was not the result of any custodial interrogation.

While Sautter and the defendant were in the police cruiser waiting for the tow truck, she completed a *Miranda* rights advisory form by reading each question to the defendant and recording his responses. The form, Exhibit 5, indicates that the defendant understood his rights and agreed to talk to Officer Sautter without an attorney. I find the officers's testimony to be credible as to the *Miranda* waiver and find that the government has met its burden of proving by a preponderance of the evidence that the defendant voluntarily waived his *Miranda* rights. *See United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004) (burden of proof).

Sautter then told the defendant she recognized him as the suspect who had run from her. The defendant responded, "Well, is it illegal to run from you? You guys did not even have your lights on." I find that the defendant made that statement after voluntarily waiving his *Miranda* rights.

To the extent the defendant's motion seeks the suppression of physical evidence based on a *Miranda* violation, the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of the suspect's unwarned but voluntary statements. *United States v. Patane*, 542 U.S. 630 (2004). The record shows no indication of coercion or police misconduct in talking to the defendant while he was in custody. I find that all of defendant's statements were voluntary for purposes of applying *United States v. Patane*.

### C. Search of Defendant's Vehicle

The officers had probable cause to stop defendant's vehicle for traffic violations. During such a stop, police officers are entitled to verify, among other things, the vehicle's registration. In this instance, they discovered that the license plates were improper. Noir could they find a vehicle identification number on the Blazer. The defendant had been placed under arrest. I conclude that the search of the Blazer was permissible either as a search incident to the defendant's arrest and or as an inventory search.

#### *1. Search Incident to Arrest*

Under *New York v. Belton*, 453 U.S. 454, 460 (1981), "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." "[T]he police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." *Id. See also United States v. Wells*, 347 F.3d 280 (8th Cir. 2003), *cert. denied*, 541 U.S. 1081 (2004); *United States v. Orozco-Castillo*,

404 F.3d 1101 (8th Cir. 2005). In this case, the officers observed the defendant abandon and run from the vehicle, leaving the driver's door open and the headlights on. About 30 minutes elapsed while the officers searched for the defendant. During that time, someone[2] returned to the vehicle, turned off the headlights, and closed the driver's door. When the defendant was found in the garage, in close proximity to the Blazer, the defendant was actually holding the keys to the vehicle. The search of the vehicle began shortly after the defendant's arrest and was conducted at the scene of the arrest. I find that the search of the Blazer was "contemporaneous to the arrest," *see United States v. Wells*, 347 F.3d at 287, and was permissible under *New York v. Belton*.

### 2. Inventory Search

Since the defendant could not lawfully drive his vehicle away from the scene, the officers took steps to impound the vehicle in accordance with the Omaha Police Department's towing policy, Exhibit 4. The policy provides that "Officers shall inventory all personal property left in the vehicle prior to the time the vehicle is turned over to the tow truck driver." Thus, the search of the defendants' vehicle appears to be permissible under *United States v. Wallace*, 102 F.3d 346, 348 (8th Cir. 1996):

> It is well established that "[t]he police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." *United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993). In other words, "[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search." *Id.* at 1176 (quoting *United States v. Rodriguez-Morales,* 929 F.2d 780, 787 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030

---

[2] It is unclear whether any police officers remained near the Blazer during the perimeter search. (52:16-53:8).

> (1992)).  In *Colorado v. Bertine*, 479 U.S. 367, 374 (1987), the Supreme Court held that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."

(Parallel citations omitted).  Later, in *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999), the Eighth Circuit stated:

> After lawfully taking custody of an automobile, police may search the automobile without a warrant to produce an inventory of the automobile's contents. *See South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). The intrusion is justified by governmental interests in protecting the owner's property while it remains in police custody, in protecting the police against claims or disputes over lost or stolen property, and in protecting the police from potential danger.  *See id.* at 369.  The Fourth Amendment is not offended if, considering the totality of the circumstances, the inventory search is reasonable. *See id.* at 373.  Inventory searches are reasonable when they are conducted according to standardized police procedures. *See id.* at 372; *see also Colorado v. Bertine*, 479 U.S. 367, 374 (1987). Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function.  *See Opperman*, 428 U.S. at 374-75. This does not mean that inventory searches are always unreasonable when standard procedures are not followed, however.  *See United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir. 1987) (failure of police to complete inventory of arrestee's belongings as policy provided after finding drugs in arrestee's suitcase did not render inventory search unreasonable where police changed plans and decided to transfer arrestee to federal authorities); *United States v. Trullo,* 790 F.2d 205, 206 (1st Cir. 1986); *see also Whren v. United States*, 517 U.S. 806, 816 (1996) (although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext).

(Parallel citations omitted).

> Finally, the Court in *South Dakota v. Opperman* long ago acknowledged that
>
> [t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.
>
> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents.  These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, ...

the protection of the police against claims or disputes over lost or stolen property, ... and the protection of the police from potential danger....

428 U.S. at 369 (citations omitted).  The Court also observed that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Id.* at 373.

Examining the totality of the circumstances surrounding the initial decision to impound and conduct an inventory search of defendant's vehicle, *see United States v. Mayfield*, I conclude the search of the defendant's vehicle was reasonable under the Fourth Amendment.

## RECOMMENDATION

For the reasons discussed above,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#19) be granted in part, and denied in part, as follows:

1.  The motion should be granted as to defendant's non-Mirandized statements that that he was in his apartment and saw someone breaking into his vehicle (the Blazer) and that he did not know the numbers of his apartment's address.

2.  The motion should be denied in all other respects.

**DATED September 20, 2005.**

> BY THE COURT:
>
> s/ F.A. Gossett
> **United States Magistrate Judge**